*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROBERT STEVEN WESTFIELD,

        Defendant-Appellant.

UNPUBLISHED
May 07, 2026
9:10 AM

No. 370261
Monroe Circuit Court
LC No. 2019-245363-FC

Before: BAZZI, P.J., and BOONSTRA and SWARTZLE, JJ.

PER CURIAM.

Defendant, Robert Steven Westfield, appeals as of right his jury trial conviction of felony murder, MCL 750.316(1)(b). Westfield was sentenced as a fourth-offense habitual offender, MCL 769.12, to life in prison without the possibility of parole. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This appeal arises out of Westfield's second trial for the death of Hunter Guthrie in April 2019. The prosecution's theory was that at a barn party in Hudson, Michigan, Westfield and his codefendant, David Nelson Richter, expected Guthrie to sell drugs for them. However, Guthrie was too intoxicated to sell any drugs and was thrown out of the party. When Westfield, Richter, Guthrie, and Natasha Werley left the party, Guthrie spit in the vehicle. Trial testimony implied that Westfield became even angrier and assaulted Guthrie in the back and stripped Guthrie of his clothes. Four days later, Westfield and Richter disposed of Guthrie's body by setting him on fire in a house in Detroit. The prosecution asked the jury to find Westfield guilty of first-degree felony murder because Westfield murdered Guthrie while unlawfully imprisoning him.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Westfield argues that he was denied the effective assistance of counsel by trial counsel's failure to present expert testimony from a forensic pathologist with a specialization in interpretive toxicology and a toxicologist to testify at trial. We disagree.

-1-

To preserve a claim of ineffective assistance of counsel, a defendant must raise the claim in a motion for a new trial or request for a *Ginther*[1] hearing. *People v Jackson (On Reconsideration)*, 313 Mich App 409, 431; 884 NW2d 297 (2015). Westfield raised this claim in a motion for a new trial and a request for a *Ginther* hearing, which the trial court denied. Westfield also moved for remand in this Court for the trial court to reconsider its decision and order an evidentiary hearing. We denied the motion.[2] Because the trial court did not order an evidentiary hearing, this Court's "review is limited to mistakes apparent from the record." *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019).

A claim of ineffective assistance of counsel involves mixed questions of law and fact. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). A trial court's findings of fact, if any, are reviewed for clear error. *People v Ogilvie*, 341 Mich App 28, 34; 989 NW2d 250 (2022). But whether the facts constitute a violation of the defendant's right to the effective assistance of counsel is a question of law that this Court reviews de novo. *Id*.

In order to establish ineffective assistance of counsel, a defendant must demonstrate "(1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Abcumby-Blair*, 335 Mich App 210, 228; 966 NW2d 437 (2020). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018) (quotation marks and citation omitted). A defendant must meet a heavy burden to overcome the presumption that trial counsel employed an effective trial strategy. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). "Trial counsel is responsible for preparing, investigating, and presenting all substantial defenses." *People v Thorne*, 322 Mich App 340, 347; 912 NW2d 560 (2017) (quotation marks and citation omitted).

At trial, Dr. Lokman Sung, the interim chief of the Wayne County Medical Examiner's office and forensic pathologist, testified regarding the results of the autopsy he performed on Guthrie. Dr. Sung pronounced the date of death as April 18, 2019, because that was the date that Guthrie's body was found. Dr. Sung was unable to determine the actual date of Guthrie's death or how long his body had been exposed to the elements. When Dr. Sung prepared his report, he relied on a toxicology report prepared by Jennifer Swatek for NMS Labs and a report prepared by Dr. Gary Burman, a forensic odontologist. Dr. Burman identified Guthrie as the decedent by comparing his teeth with x-rays of Guthrie's teeth that were taken when he was alive.

Dr. Sung testified that the NMS report indicated positive findings for substances in Guthrie's blood. Dr. Sung explained that when a person dies, their body ceases to metabolize any drugs in their system. Therefore, Dr. Sung concluded that the samples of blood recovered during the autopsy reflected Guthrie's substance levels at the time of his death. One of the substances found was ethanol, which refers to the level of alcohol found. The level of alcohol was 100

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] *People v Westfield*, unpublished order of the Court of Appeals, entered July 17, 2025 (Docket No. 370261).

-2-

milligrams per deciliter or 0.1%. Dr. Sung stated that 0.1% was not a toxic level of ethanol or alcohol. Dr. Sung did not believe that consumption of alcohol led to Guthrie's death. Dr. Sung also did not believe that the caffeine detected in Guthrie's blood contributed to his death. Dr. Sung testified that 7.8 nanograms of alprazolam, the common name for Xanax, was detected in Guthrie's blood. For reference, Dr. Sung stated that a toxic level of alprazolam would be "in the hundreds." Dr. Sung did not believe that alprazolam contributed to Guthrie's death. Dr. Sung stated that cocaethylene and benzoylecgonine were found in Guthrie's blood. These substances were "breakdown products" of cocaine. Dr. Sung testified that he was able to conclude from the toxicology report that Guthrie had metabolized any cocaine that he had consumed. Neither substance was at a toxic level that could have contributed to Guthrie's death. Dr. Sung testified that the substance known as U-47700 did not have a trade name because it was a drug that was never on the market. Dr. Sung explained the effects of U-47700 mimicked the effects of an opioid. Dr. Sung indicated that common opioids were codeine, heroin, and fentanyl. The toxic level of U-47700 ranged from 13 to 490.[3] The concentration of the substance in Guthrie's blood was 0.3, much lower than the lowest level of the toxic range. Dr. Sung did not believe that Guthrie's intake of U-47700 contributed to his death. Dr. Sung testified that each substance found in Guthrie's blood was well below its standard toxic range, and "although drugs can have a combination effect, once again these drugs are at a level that is well below toxicity." Dr. Sung did not have medical information about Guthrie that would have indicated to him that Guthrie was an outlier for purposes of the levels of toxicity for an overdose. Dr. Sung agreed that there could be a postmortem redistribution of substances that occurred in decomposition. Dr. Sung testified, however, that in his professional opinion, the levels reported by NMS represented the levels when Guthrie died.

Dr. Sung was unable to determine Guthrie's cause of death because of the fire. Dr. Sung found that there were extensive burns to 97% of Guthrie's body, to the extent that his extremities separated from his body. Dr. Sung testified that the extensive burns also prevented an examination of injuries to soft tissue and blood vessels. Dr. Sung's examination of the rest of Guthrie's organs did not reveal any "disease processes" that would have caused death. Dr. Sung testified that after examining the remaining structures of Guthrie's body, he did not discover any injury to those structures. Dr. Sung clarified that his inability to identify any injuries because of the burns did not mean that Guthrie did not sustain any injuries. Although Guthrie's brain had started to coagulate because of the heat, Dr. Sung did not observe any bleeding in the brain. Dr. Sung looked for evidence of bleeding to indicate a brain injury. Dr. Sung testified that he did not observe any ligature marks on the skin that remained on one of Guthrie's arms.

Dr. Sung classified Guthrie's death as a homicide. Dr. Sung explained that there were only five manners of death in Michigan: natural, homicide, suicide, accident, and indeterminate. In order to determine that a cause of death was a homicide, Dr. Sung had to find that there were objective suspicious circumstances surrounding the cause of death, that there were no toxicologic or anatomic causes of death, and that there were no environmental circumstances, such as a flash flood, hurricane, or tornado. Dr. Sung also had to find that there was "no other reasonable cause

---

[3] Dr. Sung did not identify the unit of measurement these numbers represented.

of death that had been proposed." Dr. Sung testified that these diagnostic criteria were generally accepted in the forensic community.

Dr. Sung further asserted that he was unable to exclude asphyxia, such as strangulation or smothering, because any soft tissue that he would normally examine for such injuries was destroyed in the fire. He also could not exclude sharp force injuries, such as those caused by a knife or a bullet, because the fire consumed the extremities and soft tissue. Because the skull and portions of Guthrie's face were consumed by the fire, he could not exclude blunt force trauma. Any bruising was also obscured by the fire.

Dr. Sung analyzed Guthrie's carbon monoxide level and found that it was negative. From this finding, Dr. Sung concluded that Guthrie did not breath in any smoke that would have caused his death. Dr Sung did not find any "well-defined soot in the airway" indicating that Guthrie was not alive when his body was burned. Dr. Sung testified that he did not submit any tissue from Guthrie's body for a microscopic examination because, in addition to the burn injuries, the body and organs had begun to decompose. Dr. Sung explained that when the body and organs decompose, decomposing or dying tissue will be the only injury revealed under the microscope. In an undecomposed body, a microscopic examination might reveal "disease processes such as a heart attack in the heart or changes in the kidney that would be significant and sufficient for death." Dr. Sung stated that although uncommon, he found a manner of death, homicide, but not the cause of death. Dr. Sung had examined a "handful" of cases in which he determined the manner of death, but not the cause.

At trial, defense counsel confirmed that Swatek, a forensic toxicologist, was Richter's witness. Swatek was qualified as an expert in forensic toxicology. Swatek tested two tubes of peripheral blood, cardiac blood, and a liver tissue. Swatek defined peripheral blood as blood taken from an individual's extremities. Swatek explained that postmortem redistribution can affect drug concentrations and that peripheral blood experiences the least amount of postmortem changes. Swatek also explained that postmortem concentrations do not equate with concentrations found in a living human for multiple reasons.

Swatek found ethanol,[4] which she explained as "standard drinking alcohol." She found alprazolam, which is a benzodiazepine, a central nervous system depressant. She also found cocaethylene and benzoylecgonine, which are metabolites of cocaine, a central nervous system stimulant. She also found U-47700. Swatek described U-47700 as "a designer opioid which can have similar effects to say morphine." Swatek testified that these results would not have been the same at the time of Guthrie's death. Swatek explained that cocaine is a very fast acting drug and is unstable. In a postmortem study, cocaine is not always found because of its breakdown. Such studies are more likely to find benzoylecgonine as an indicator for cocaine use.

Swatek did not have any information about Guthrie, other than that his body had been burned. Swatek testified that there were no published studies regarding the effect heat may have

---

[4] The transcriptionist typed fentanyl here, which was clearly a typo considering Dr. Sung's testimony and Swatek's testimony that it was "standard drinking alcohol."

-4-

on the toxicology result or level. Swatek stated that "in theory," it was possible that heat could affect the toxicology level. Swatek explained that because cocaine was very unstable, it was possible it might break down even more with heat. However, Swatek could not conclude to what extent Swatek testified that she could not opine on whether any of the substances found in Guthrie's blood caused an overdose. Swatek further explained that she did not have an opinion on that because she was not a medical examiner and did not know the totality of the circumstances. "[T]hat's not my job."

## A. EXPERT WITNESS

Westfield first argues that he was denied the effective assistance of counsel by defense counsel's failure to present testimony from a forensic pathologist with a specialization in interpretative toxicology. We disagree.

At trial, defense counsel argued that the jury could not find beyond a reasonable doubt that Westfield had murdered Guthrie because it was possible that Guthrie died from an overdose. To support his motion to remand for a hearing on his ineffective assistance of counsel claim, Westfield submitted an offer of proof, in which Westfield's appellate attorney stated that she spoke with defense counsel, and defense counsel confirmed that his theory of the case was that Guthrie died of an overdose. Defense counsel reported that, before trial, he consulted with Dr. Ljubisa Dragovic, a medical examiner for Oakland County. Dr. Dragovic agreed with Dr. Sung's conclusion that Guthrie's cause of death was not determinable, but that the manner of death was unnatural. Dr. Dragovic refused to opine on the possibility of Guthrie dying from an overdose, or that his body's exposure to the fire lowered his drug levels, because he was not a toxicologist. Defense counsel also contacted Swatek and Ben Kuslikis, both toxicologists, to determine whether elevated drug levels could have been burned away in the fire.

Westfield also presented a report created by a forensic pathologist from Kentucky, Dr. John Hunsaker, who opined that Guthrie's death should have been classified as accidental because it was possible that the drug levels found in Guthrie were toxic and caused his death. Dr. Hunsaker further opined it was probable that Guthrie died from an overdose because of the toxic effects of all of the substances found in his blood.

Westfield relies heavily on *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015), to support his argument that trial counsel's performance was deficient because he failed to secure "an expert with a specialized background at the intersection of forensic pathology and interpretive toxicology," such as Dr. Hunsaker. In *Ackley*, the defendant was convicted of first-degree felony murder and first-degree child abuse after his girlfriend's three-year-old daughter died while in his care. *Id*. at 384. The defendant claimed that "the child had been napping alone in her room before he discovered her lying unresponsive on the floor next to the bed." *Id*. The prosecution's theory was that the defendant had killed the child by blunt force trauma or shaking and called five medical experts to testify at trial. *Id*. Because the case involved "the unexplained and unwitnessed death of a child," this Court found that "expert testimony was the cornerstone of the prosecution's case." *Id*. at 383-384. The experts testified "that the child died as a result of abusive head injury caused either by nonaccidental shaking, blunt force trauma, or a combination of both." *Id*. at 384. Defense counsel contacted one expert in preparation for trial. *Id*. at 385. The expert agreed with the

prosecution's experts and informed defense counsel that his testimony would not help the defendant. *Id*. The expert explained that "there was a marked difference of opinion within the medical community" regarding the shaken baby syndrome or abusive head trauma diagnosis and that experts usually had "deeply held beliefs about when each diagnosis is supported[.]" *Id*. However, the initial expert referred defense counsel to consult with a certain expert that "was significantly more likely to agree with the defendant's claim that the child's death" was accidental. *Id*. at 390.

The Michigan Supreme Court ruled that the defense counsel's failure to present any expert testimony to rebut the prosecution's expert testimony "constitute[d] a constitutional flaw in the representation of the defendant," and did not constitute a reasonable strategy. *Id*. at 392 (quotation marks and citation omitted). The *Ackley* Court ruled defense counsel's failure was especially deficient because of the "substantial contradiction" in "this area of expertise," the absence of any testimony to rebut the prosecution's experts, and defense counsel's failure to adequately prepare to challenge the prosecution's experts. *Id*. Contrary to Westfield's argument, the *Ackley* decision does not render a trial counsel's performance deficient for failure to secure an expert to oppose the prosecution's experts. Additionally, the Michigan Supreme Court did not dispute the general proposition that "counsel is not required to shop for experts until finding one that will offer favorable testimony." *Id*.

Unlike in *Ackley*, Dr. Sung's and Swatek's testimony was not the only evidence against Westfield. The prosecution presented evidence that Westfield beat Guthrie in the vehicle as they traveled from the party to Monroe. The prosecution also presented evidence that Westfield and Richter attempted to scrub the vehicle of Guthrie's blood. Moreover, the prosecution presented evidence from which the jury could have inferred that Westfield attempted to conceal his murder of Guthrie by placing Guthrie in an abandoned house in Detroit and setting it on fire.

In the instant case, Dr. Sung did not opine on the cause of death. Rather, Dr. Sung testified that he was unable to find a cause of death because of the state of Guthrie's burned body. However, Dr. Sung did conclude that the controlled substance levels found in Guthrie's blood would not have caused an overdose. In Dr. Hunsaker's prepared report, he stated that he would have classified Guthrie's death as an accidental overdose. Dr. Hunsaker concluded that Guthrie overdosed due to the "toxic effects of the combined drugs found in his system." However, Dr. Hunsaker also stated that "[t]he exposure to extreme heat and the significant degree of postmortem decomposition coupled with the ignorance about his tolerance complicate any assessment of whether [Guthrie] died from acute combined drug toxicity."

Considering this evidence, Westfield has not demonstrated that defense counsel's failure to call an opposing expert "fell below an objective standard of reasonableness under prevailing professional norms...." *Abcumby-Blair*, 335 Mich App at 228. Defense counsel consulted with another forensic pathologist who told him that he could not opine on whether Guthrie died of an overdose or whether the fire interfered with the controlled substance levels in his blood because he was not a toxicologist. Defense counsel then consulted with two toxicologists, who he decided not to call. The expert that Westfield presents in his motion to remand agreed that the extreme heat and postpartum decomposition complicated any conclusion of whether Guthrie died from the combined drug toxicity. Moreover, Dr. Hunsaker opined that the choices for the cause of an overdose were either suicide or accident, overlooking Hunner Mravec's testimony that Richter

gave Guthrie a Xanax at the barn party when Guthrie was already extremely intoxicated and needed help standing and walking. Because Westfield has failed to establish that defense counsel's performance fell below an objective standard of reasonableness, he has failed to establish that he was denied the effective assistance of counsel.

## B. JENNIFER SWATEK

Next, Westfield argues that defense counsel was ineffective for failing to call Swatek as a witness. We disagree.

Richter's defense counsel called Swatek as a witness. Swatek testified regarding the findings contained in the toxicology report that she submitted to Dr. Sung. Defense counsel argued in his closing argument that Swatek's testimony cast doubt over the cause of Guthrie's death. Neither did the parties' request nor did the trial court instruct the jury that it could only consider Swatek's testimony for Richter's case. Accordingly, the jury was free to consider Swatek's testimony as to both defendants. Even if defense counsel was ineffective for failing to call Swatek as Westfield's witness, because the jury was free to consider her testimony as to Westfield, Westfield has failed to demonstrate that the outcome of his trial would have been different. Because we do not find that defense counsel was ineffective, we also deny Westfield's request to find that defense counsel's cumulative errors require reversal.

## III. SUFFICIENT EVIDENCE

Westfield argues that his felony murder conviction violated his due-process rights because it was not supported by constitutionally sufficient evidence. Westfield asserts that the evidence was insufficient to establish that Westfield caused Guthrie's death while unlawfully imprisoning Guthrie. We disagree.

This Court reviews challenges to the sufficiency of the evidence de novo. *People v Solloway*, 316 Mich App 174, 180; 891 NW2d 255 (2016). This Court must determine whether the evidence was sufficient to justify a rational trier of fact's conclusion that the evidence proved the essential elements of the crime beyond a reasonable doubt. *Id*. This Court must also "draw reasonable inferences and make credibility choices in support of the jury verdict." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (quotation marks and citation omitted). This Court will not interfere with the trier of fact's determination of the weight of the evidence or credibility of the witnesses. *People v Kanaan*, 278 Mich App 594, 618; 751 NW2d 57 (2008).

> The elements of first-degree felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated [in MCL 750.316(1)(b)... ]. [*People v Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007) (quotation marks and citation omitted; alterations in original).]

"The facts and circumstances of the killing may give rise to an inference of malice." *People v Carines*, 460 Mich 750, 759; 597 NW2d 130 (1999). "A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *Id*.

MCL 750.349b defines the elements for unlawful imprisonment:

(1) A person commits the crime of unlawful imprisonment if he or she knowingly restrains another person under any of the following circumstances:

(a) The person is restrained by means of a weapon or dangerous instrument.

(b) The restrained person was secretly confined.

(c) The person was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony.

The statute defines "restrain" as forcibly restricting "a person's movements" or forcibly confining "the person so as to interfere with that person's liberty without that person's consent or without lawful authority." MCL 750.349b(3)(a). "For purposes of unlawful imprisonment, sufficient 'force' can constitute any use of power, violence, or pressure exerted upon a person to restrict that person's movements, or to confine that person in a manner that interferes with the person's liberty." *People v Jarrell*, 344 Mich App 464, 477; 1 NW3d 359 (2022).

On April 13, 2019, Guthrie checked into Room 217 at the Baymont Inn in Monroe, and Westfield checked into Room 221. Mravec provided security for a barn party in Hudson, Michigan, on the evening of April 13, 2019, into the morning of April 14, 2019. Around 11:00 p.m., several guests informed Mravec that Guthrie was extremely intoxicated, belligerent, and harassing people. Mravec moved Guthrie to the front of the barn so that Mravec could supervise him and eventually moved him outside of the barn because Guthrie was harassing everyone that passed. Guthrie vomited and urinated in his pants. When Guthrie's phone rang, Mravec answered it and realized that the caller was walking toward him. Mravec identified the two men walking toward him as Westfield and Richter. Westfield and Richter were upset with Guthrie's condition. When Guthrie spit on Westfield, Westfield threatened to beat Guthrie. Mravec described Westfield as aggressive, angry, and threatening.

Mravec moved Guthrie into a small room and left Richter with him. When Richter left the room, he told Mravec that he had given Guthrie a Xanax to calm him down. When the owner of the barn arrived, he ordered Mravec to remove Guthrie from the party. Mravec told Westfield and Richter that they had to leave the party and take Guthrie with them. Mravec assisted Guthrie to Westfield's vehicle. Westfield told Mravec to put Guthrie in the trunk because the vehicle was a rental. Mravec refused and put Guthrie in the rear passenger seat.

Natasha Werley testified that she sat in the front passenger seat when Guthrie and Westfield got into the vehicle. Richter drove the vehicle and Westfield sat in the backseat with Guthrie. Natasha testified that Westfield "beat" Guthrie in the back seat because Guthrie had spit on the floor. Natasha thought that Westfield took breaks from beating Guthrie but observed Westfield continue to hit him during the ride back to Baymont Inn. When Natasha looked into the backseat,

she saw that Guthrie was bleeding "a lot." Natasha testified that Guthrie was naked in the backseat. Natasha did not know how or when Guthrie became naked but knew that it was sometime during the ride back to the Baymont Inn. Richter told Natasha not to look in the backseat and rubbed her shoulder. Nathasha thought that Richter rubbed her shoulder because she was scared. When they arrived, Natasha accompanied Richter to Guthrie's room to look around. Natasha did not know what they were looking for. When Natasha returned to the vehicle to get her belongings, she saw Guthrie in the vehicle, and he was still alive.

When housekeepers entered both rooms in the afternoon of April 14, 2019, they reported to Stephanie Pipkin, the manager, that the rooms were in complete disarray. Pipkin testified that Room 217 had been completely ransacked. The vent covers had been taken off of the walls, light fixtures were dismantled, all of the drawers had been pulled out of the dresser, pictures had been taken off of the walls, and the mattress was on the floor. Drug paraphernalia have been left in Room 221, drug residue had been left on the nightstand, and the room smelled like smoke. Pipkin reported the condition of Room 217, and the police returned later inquiring about Room 221 and video footage.

Christopher Rafter, Guthrie's neighbor and friend, had gone to the barn party with Guthrie. Rafter left about 20 minutes after arriving because Guthrie was so intoxicated. When Rafter woke up the next morning, he went to Guthrie's house and noticed that the front door was open. Rafter described Guthrie's house as in complete disarray, with items strewn about the house, and dressers flipped over. Rafter could not see the floor. On April 15, 2019, Rafter texted Paige Purcell, Guthrie's old girlfriend, to tell her that he was concerned about Guthrie. When Purcell arrived, she immediately called Guthrie's grandmother, who lived next door, and the police.

Detective Jeff Hooper of the Monroe Sheriff's Department was assigned Guthrie's missing person complaint. Detective Hooper made an exigent request for Guthrie's phone records, which led him to the Baymont Inn. Detective Hooper watched the video from Baymont Inn and observed Guthrie going from his room to Westfield's room. From that information and information from the employees at the Baymont Inn, Detective Hooper was able to make an exigent request for phone records that was registered to Westfield and discovered Westfield's rental agreement for the vehicle with Enterprise.

On April 18, 2019, around 2:00 a.m., Craig Brown, a city of Detroit firefighter, was dispatched to a house fire at 1107 Liebold Street in Detroit. When Brown arrived, the house was completely engulfed in flames. As the fire was extinguished, Brown began peeling back the rubble so that it would not smolder. He recognized a skull in the rubble and realized he had discovered a body. The fire arson investigator for the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Lieutenant John Davis, thought that the fire started about 1:00 a.m., an hour before the fire department arrived. Lieutenant Davis observed that the body was completely charred, unrecognizable, and missing its limbs. Lieutenant Davis concluded that the fire had been intentionally set because the site smelled of gasoline. Lieutenant Davis also stated that because the house was abandoned, there was no power to the house. Lieutenant Davis opined that the fire was intentionally set to conceal a crime.

Law enforcement was eventually led to 4676 Remembrance Road in Walker, Michigan, on April 19, 2019. Lieutenant Nathan Grant of the Michigan State Police was assisting the Monroe

County Sheriff's Office in surveilling the residence where Westfield and Richter were believed to be staying. When Westfield and Richter drove away, Lieutenant Grant followed them, and Lieutenant Christopher Carns initiated a traffic stop. Westfield was driving, and Richter was in the passenger seat. Lieutenant Carns observed Richter throw a bag of a white powdery substance in his mouth. The officers returned to Remembrance Road and received permission to look in the garage.

The officers discovered Westfield's rental car in the garage. The trunk was open, and the carpet had been pulled from it. There were bottles of bleach in the trunk. A search warrant was executed. The officers found two bottles of bleach, empty bottles of hydrogen peroxide, and two vacuums. The car smelled of blood, and there was bloody water in the bucket of the shop vacuum. There was human blood detected throughout the vehicle. The trunk lid was open, and the carpet had been pulled out of it. There were dark stains on the carpet that had been removed. The officers found charred clothing in the firepit in the backyard. The clothing resembled clothing that Guthrie had been wearing in the Baymont Inn videos.

A special agent with the Federal Bureau of Investigation, George Rienerth, traced Westfield's phone to the party in Hudson, the Baymont Inn, the location of the fire, Saginaw, and Walker. Special Agent Rienerth also traced Guthrie's phone from Monroe to the party location in Hudson. The last phone record for Guthrie's phone was April 14, 2019, when he received three phone calls that were not answered. Richter's phone was in the vicinity of the location of the fire on April 14, 2019, between 5:40 p.m. and 7:19 p.m. Westfield's phone traveled from Walker to the fire location on April 17 to 18, 2019 between 9:00 p.m. and 1:00 a.m. Then Westfield's phone traveled from the fire location to Walker.

The prosecution presented sufficient evidence of the elements of felony murder. There was evidence that Guthrie died and that he died before the fire. Regarding the second element, the jury could have inferred that Westfield acted with malice when he beat Guthrie in the rental vehicle on the ride from the party in Hudson to the Baymont Inn in Monroe and eventually caused his death. Natasha testified that Guthrie was still alive when they arrived at the Baymont Inn. Because Guthrie was not seen after the parties' arrival at Baymont Inn, the jury could have inferred that Guthrie died sometime after arriving at Baymont Inn. There was no other activity on Guthrie's phone after the party, except for unanswered calls on April 14, 2019. Westfield clearly tried to distance himself from these events by cleaning Guthrie's blood out of the rental car and burning Guthrie's clothing. Finally, Westfield's phone was traced to the site of the fire on April 14, 2019, and again on April 18, 2019. The time Westfield's phone was located at the location of the fire on April 18, 2019, coincided with the time Lieutenant Davis opined that the fire started. Accordingly, there was sufficient evidence for the jury to conclude that Guthrie died sometime after Westfield continued beating him until they arrived in the parking lot of the Baymont Inn.

Additionally, the jury could have inferred that Westfield restrained Guthrie to facilitate his murder. MCL 750.349b(1)(c). When Westfield, Richter, and Werley left the party with Guthrie, Westfield asked Mravec to help him put Guthrie in the trunk of the vehicle. Mravec refused, and they placed Guthrie in the backseat. Sometime during the ride, Guthrie was stripped of his clothing presumably to prevent him from leaving the vehicle. There was also evidence of blood in the trunk of the vehicle leading to a reasonable inference that Guthrie had been in the trunk of the vehicle at some point. Richter told Werley to stop looking in the backseat at Westfield and Guthrie. Richter

-10-

also rubbed Werley's shoulder as if to pacify her because she was scared. When they arrived at the Baymont Inn, Westfield left Guthrie, who was still alive, in the vehicle. The jury could have inferred that Guthrie died in the vehicle after the parties left the vehicle. Furthermore, Dr. Sung testified that Guthrie had died before the fire. Dr. Sung also testified that Guthrie did not die of an overdose. Viewed in a light most favorable to the prosecution, the evidence was sufficient to show that Westfield restrained Guthrie to facilitate the commission of his murder.

IV. UNAVAILABLE WITNESS

Westfield argues, in a Standard 4 brief, that the trial court abused its discretion by finding that a witness was unavailable and allowing the admission of the witness's preliminary examination testimony. We disagree.

This Court generally reviews a trial court's decision to admit evidence for an abuse of discretion, *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017), but constitutional questions, such as those concerning the right of confrontation, are reviewed de novo, *People v Fackelman*, 489 Mich 515, 525; 802 NW2d 552 (2011). A court abuses its discretion when its decision falls "outside the range of principled outcomes." *People v Thorpe* 504 Mich 230, 252; 934 NW2d 693 (2019). This Court also reviews a trial court's determination of due diligence for an abuse of discretion. *People v Eccles*, 260 Mich App 379, 389; 677 NW2d 76 (2004). The trial court's factual findings are reviewed for clear error. *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009).

At trial, the prosecution moved in limine requesting that the trial court declare Natasha an unavailable witness. The prosecution argued that the police were unable to locate Natasha to serve her with a subpoena to testify at trial. The prosecution asked the trial court to permit the prosecution to enter Natasha's preliminary examination testimony as evidence. Westfield opposed the motion, arguing that Natasha was a major witness in the case.

At the hearing on the motion, Detective Hooper testified that he received the subpoena to serve Natasha on October 10, 2023, and began attempts to serve her on October 16, 2023. Detective Hooper drove to the address on the subpoena and encountered Ellen Marie Werley, Natasha's mother. Ellen told Detective Hooper that Natasha had not lived at that address for some time. Ellen stated that Natasha had an apartment downriver, but she did not know the address. Ellen confirmed that the phone number Detective Hooper had was Natasha's current phone number. On October 17, 2023, Detective Hooper called Natasha, but no one answered.

Detective Hooper attempted contact via phone on November 22, 2023. Natasha did not answer, and Detective Hooper did not leave a voicemail. On January 2, 2024, Detective Hooper went to the home of Natasha's grandfather, Frank Werley, in Woodhaven. He knocked on the front and side doors for about five minutes, but no one answered. The white Ford Flex registered to Ellen was parked in the driveway. Detective Hooper drove directly to Joel Werley's address in Woodhaven. Joel was Natasha's father. A young girl answered the door and told Detective Hooper that Natasha did not live there and that he should try Frank's house. Detective Hooper left a business card and asked the girl to call him if she saw Natasha. Detective Hooper contacted the Inspector General's office to inquire if Natasha received state benefits, had any open cases with the state of Michigan, or work records. The only information Detective Hooper received were

-11-

addresses that he already had. He also contacted Brownstown Township Police Department because he discovered a misdemeanor arrest warrant for failure to appear in Brownstown Township. The Brownstown Township police confirmed Frank's and Ellen's addresses and provided another address on Gibraltar Road. The apartment office was closed, and no one answered the door at the address. On January 24, 2024, Detective Hooper contacted the apartment manager. The apartment manager confirmed that Natasha had lived there, but she moved out on November 1, 2023, and did not leave a forwarding address.

On January 9, 2024, Detective Hooper went to the Monroe post office and checked with a supervisor for any forwarding address information. The post office provided Ellen's address as the only address it had on file. Detective Hooper contacted Michigan Gas but was unable to get any information. Detective Hooper also returned to Frank's home on January 9, 2024. He knocked on the front and side doors for about five minutes. He observed an older woman look out the door. She did not identify herself, but Detective Hooper later learned that the woman was Natasha's grandmother. While he was waiting to talk to the woman, Frank drove up in a white van and introduced himself. Frank went into the house and went down into the basement. Detective Hooper waited for about five minutes. When Frank returned, he told Detective Hooper that Natasha was not there, and he did not know where she was. Detective Hooper gave Frank his card asked him to tell Natasha to call. Frank told Detective Hooper that Natasha was not currently employed.

On January 17, 2024, Detective Hooper contacted Natasha's number from a blocked number. A woman answered, but when Detective Hooper asked for Natasha, the woman told him he had the wrong number and hung up. Detective Hooper also consulted VINElink and the Law Enforcement Information Network to check if Natasha was in jail. He also sent her messages via Facebook Messenger asking her to contact the Monroe County Sheriff's Detective Bureau.

Detective Hooper contacted Tarina Freeman, who was the mother of Deena Freeman, another witness in the case. Tarina told the officer that she had reached out to Natasha in the fall of 2023, when Tarina received a subpoena to testify in this case. Tarina screenshotted the conversation and gave it to Detective Hooper. The officer was able to confirm that he had sent Natasha messages via Facebook Messenger using the proper Messenger profile. A copy of Tarina's conversation with Natasha was admitted as evidence at the hearing, and Detective Hooper read the messages into the record. Tarina informed Natasha that Deena had received a subpoena to testify in Westfield's second trial. Natasha asked what that meant for her. Tarina told her that if she and Deena did not testify after receiving the subpoena, they could be arrested. Tarina sent a picture of the subpoena with the date and time. Natasha was upset that her name and age appeared in the newspaper during the first trial. Tarina messaged Natasha again on January 10, 2024, informing Natasha that the prosecutor was looking for her and sent another picture of the subpoena.

After speaking with Tarina, Detective Hooper drove to Joel's residence. He made contact with a woman who identified herself as Natasha's stepsister, Melanie. Melanie advised Detective Hooper that Natasha did not live there, and that Melanie did not have Natasha's phone number. Detective Hooper drove to Frank's home and observed a white Ford Flex and a black Chevrolet Blazer in the driveway. He spoke with Frank. Frank told him that Natasha had not been to his

-12-

home for approximately five days and that she was staying with an unknown friend. Frank confirmed that he gave Detective Hooper's business card to Natasha.

On January 25, 2024, Detective Hooper contacted Frank again. Frank denied seeing Natasha. Detective Hooper again called Natasha's number and left a message. He also checked with the water departments in Monroe, Frenchtown, and Woodhaven for accounts in her name and did not find any. He also checked area hospitals to determine if Natasha was a patient. Detective Hooper checked phone logs to determine if any inmates in the jail had been in contact with Natasha and did not find any contacts.

Detective Hooper testified that he had been able to serve Werley a subpoena for the first trial, and she was very cooperative with him. He witnessed her testimony and observed that she was a very reluctant witness. Detective Hooper had anticipated that Werley would be cooperative again. He opined that he had been unable to locate her because she was avoiding him to avoid testifying.

Detective Kenneth Dodds of the Monroe County Sheriff's Office also testified regarding his efforts to locate and serve Werley. On January 17, 2024, Detective Dodds made his first attempt to contact Natasha by driving to an address in Wyandotte connected to her. When Detective Dodds knocked on the door, two girls answered and denied that Natasha was there. The teenage girls advised that Natasha stayed there intermittently and provided Detective Dodds with a phone number. When Detective Dodds called the phone number, a woman answered but hung up when Detective Dodds introduced himself as a detective with the Monroe County Sheriff's Office. Detective Dodds called the number one or two more times after the woman disconnected the call, to no avail.

Detective Dodds testified that on January 18, 2024, he returned to Frank's address at 8:00 a.m. When he knocked on the door, no one answered. Detective Dodds waited outside and observed a Ford Flex pull into the driveway. Detective Dodds testified that a woman exited the vehicle who matched Natasha's description. Detective Dodds had received a photograph of Natasha when he was assigned to locate her. As Detective Dodds approached, the woman went inside the house. Detective Dodds knocked on the door multiple times, but no one answered. Detective Dodds discovered that the Ford Flex was registered to Ellen. Detective Dodds discovered Ellen's telephone number and tried to reach her. Detective Dodds made several attempts, but Ellen did not answer. Detective Dodds waited outside of the residence for two or three more hours, but he did not detect any movement.

On January 23, 2024, at 4:30 p.m., Detective Dodds returned to Frank's address again and noticed the Ford Flex and a black Chevrolet sport utility vehicle in the driveway. Detective Dodds knocked at the front and side doors multiple times, but no one answered. Detective Dodds sat outside for a couple of hours. No one traveled into or out of the house while he waited. Detective Dodds did not make any further attempts to locate Natasha.

The trial court found that the testimony clearly established that law enforcement spent a "tremendous amount of time and effort" to locate Natasha. The trial court found that the efforts were significant and reasonable. The trial court found that the prosecutor was duly diligent and

performed reasonable steps to serve Werley. The trial court deemed Werley unavailable and allowed her preliminary testimony to be entered at trial.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him[.]" US Const, Am VI. This right to confrontation applies to the states through the Due Process Clause of the Fourteenth Amendment. *Pointer v Texas*, 380 US 400, 406; 86 S Ct 1065; 13 L Ed 2d 923 (1965). However, this "right is implicated only for 'testimonial' evidence, because the Confrontation Clause applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' " *People v Bruner*, 501 Mich 220, 227; 912 NW2d 514 (2018), quoting *Crawford v Washington*, 541 US 36, 51; 124 S Ct 1354; 158 L Ed 2d 177 (2004). "Former testimony is admissible at trial under both MRE 804(b)(1) and the Confrontation Clause as long as the witness is unavailable for trial and was subject to cross-examination during the prior testimony." *Garland*, 286 Mich App at 7.

Unavailability includes a situation in which a declarant is absent from a trial or hearing, and, in a criminal case, due diligence is shown. MRE 804(a)(5). Due diligence is established by the prosecution's "attempt to do everything reasonable, not everything possible, to obtain the presence of a witness." *Eccles*, 260 Mich App at 391. When inquiring into the reasonableness of the attempt, the trial court must ask "whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it." *People v James (After Remand)*, 192 Mich App 568, 571; 481 NW2d 715 (1992). Considering the testimony of Detective Hooper and Detective Dodds, we do not believe that the trial court abused its discretion in determining that the prosecution established due diligence and allowing the prosecution to present Natasha's preliminary examination testimony.

Affirmed.

/s/ Mariam S. Bazzi
/s/ Mark T. Boonstra
/s/ Brock A. Swartzle